May it please the court, my name is David Abney, representing the plaintiffs' appellants. We ask for a remand for a trial on certain types of damages that the district court refused to allow the jury to consider in the original trial. One of the major types is punitive damages. I submit to the court that the conduct of the companies in this case in failing to actually objectively test about the chemical composition of the toy beads right at the very start of the process, before they started distributing them, was something that reflects a conscious disregard and a deliberate indifference. The toy beads were not really supposed to be used by infants, and they weren't supposed to be eaten. But the testimony of the case was that, naturally enough, as any parent would know, little children, when they get a hold of bright colored things, go straight into their mouths. And if they can possibly eat them, they not only put them in their mouths, but they eat them as well. But these companies didn't know what they were marketing. They didn't know that the product was effectively a poison, and that when you ingest that kind of thing, that it changes into the date rate drug, which resulted in the hospitalization on an emergency basis of the child, three days in the hospital, coma, respiratory problems, vomiting, and all the other very unpleasant symptoms that the child had to go through. It seems logical to me, and I submit to the court that it is logical, if you're going to be selling a product like this, at the very least, you should objectively test it and know exactly what it's made of. Unlike most toy beads, you spritz water on most toy beads, they simply get wet. You put these into a pattern, though, and spritz water on them, and they freeze together and stay put. I think anybody would know there's some sort of chemical process going on there. This is not the normal thing for beads to do, and you want to know why and exactly what is in the product. The second point for supporting punitive damages is that the Chinese manufacturer, JSSY, intentionally put this compound, this substance, into the beads. Intentionally did a wrong thing. What's your evidence of that? The evidence of that is that... You know that the standard is to show an evil mind. Oh, sure. So, what's your best evidence to show that? Well, for JSSY, they did intentionally use a particular compound to make the beads. And then they covered that up. They didn't give the product list. The ingredient list did not go up the chain to the distributors. They supposedly provided samples for testing, but there you've got the fox in the henhouse kind of problem. Were those samples actually samples that they were using this substance? But they were undeniably using this substance. How do you get around the Coleman case in your argument for punitive damages, where the product was hurting people, it was clear this was happening, and there's still no punitive damages? The bar for punitive damages in Arizona law is very high. Well, there's two things there. The last part, I don't think it's really as bad as people say. It's conscious disregard, deliberate indifference. I think you can often show those sorts of circumstances. To return to the first part, Coleman is a fascinating case. These old kind of lanterns, you probably used them on camping trips, you used to pump them up. And what would happen is many times the liquid would spurt out, it would catch fire, and bad things happen when that sort of thing occurs. Well, the Coleman company, unlike these companies, had tested that over and over and had said, well, we think based upon our testing that this product is reasonably safe for use by consumers. That sort of testing didn't happen here. There was some testing. So in Coleman there was testing, but nevertheless, gas was shooting out, lighting fire and lighting people on fire. That's pretty bad injury and pretty evident once it starts happening. True. And yet even the company kept selling it, and the court says still no punitive damages. True. So how do you, I mean, that's a lot more knowledge than you have here. So I'm not sure punitive damages is your strongest argument. Well, on this particular point, the problem is that there was no actual testing by the distributors of the product. They relied upon JSSY and its representations and what it was doing. So there was some testing. Even the Consumer Product Safety Commission, though, said the testing was inadequate. The testing really wasn't the issue. They said that after the fact. Well, yeah. Well, I mean, after the fact because JSSY was keeping this undercover, and Moose Enterprises and Spinmaster hadn't done their own objective testing at that point. That didn't happen until October 2007 after the fact, after this young child was injured. So there is enough there, I submit, that they deliberately had no clue that there was any sort of problem. Coleman had a clue, and it decided that on balance it was okay to be selling this kind of product. So if you have a clue and that's not enough for punitive damages, how can having no clue give you punitive damages? Well, you deliberately blind yourself. You're not investigating at all. You simply don't look. And I think that's the big problem here on this aspect of punitive damage. They simply didn't look. And how can you market a product like this when you simply don't look? You need to know what you're putting out in the market, especially when you know that this is going to get in the hands of little children. Because, I mean, it's designed to go into households with children a little bit older than 16 months, sure. But if you get in a household with children a little older than, you know, a little up in age, you're going to have little ones around in many households, and this sort of thing is going to happen. When we're talking about JSSY, though, we're not talking about conscious disregard and deliberate indifference. JSSY intentionally did a bad thing, and they were the agent of Moose Enterprises. Is there any evidence that they knew that using this chemical would have any effect like you're alleging it did here? I think the evidence is new or reasonably should have known, reasonably should have known. They were putting this particular chemical in, and one of its known properties is that when it's metabolized within the human body, it converts into GHB. But so my question is, is there any evidence that they, I mean, are there documents where they say, we know if we put this in, kids are going to have comas? I don't think so. I don't think so. But then again, when you're dealing with evidence at a trial, as you know, the jury is allowed to make reasonable inferences from the evidence. I think reasonable jurors could make a reasonable inference that if you're putting this kind of chemical into a toy, and you are a manufacturer dealing with chemicals that you know or should reasonably know, that it's going to cause problems. Another thing I think that bolsters the punitive damages, it is a crime to import this kind of chemical into the United States. I mean, how can Moose Enterprises and Spin Master say they're innocent here, there's no wrongdoing when they were committing a crime? The other types of damages that relate to the father, I just want to touch on that briefly, if I may irrigate myself here. Okay. Thank you. The trial court did not let the father present evidence of emotional distress, damages passed in future medical expenses on the basis of judicial estoppel. And the father had gone through a bankruptcy and did not disclose that this lawsuit was an asset of the estate. That's a common problem. I did it myself when I was first starting personal injury practice. I got a call out of the blue after I settled a $15,000 traffic accident from the trustee saying, what are you doing? And I had to sweet-talk the trustee on my knees to say, don't punish me, I'm just dumb. I didn't know that this is considered an asset of the estate. So judicial estoppel slams down, and you really have sort of the dead hand of the common law here, which sometimes defeats common sense. But judicial estoppel is a clear rule, so it sounds like you may have had a personal experience of getting around it, but do we have any case law that says if someone claims a mistake and continues to not correct it for many years, that that is a way around judicial estoppel? I don't think there was any evidence of not correcting it for many years. It just came up, and he said, I'm sorry. But he was litigating this case for a long time and didn't say anything about the bankruptcy. And didn't correct anything in the bankruptcy. Yes. Yes. Didn't realize that that was wrong. Didn't realize that he had made a mistake. So the judicial estoppel comes in now and says, okay, and there are cases, the United States Supreme Court, this court's cases, I cited them in the briefing, that says there are circumstances where we don't apply judicial estoppel in this sort of circumstance with the bankruptcy cases. Can you tell me what is your best case for the idea that just not realizing is a way around judicial estoppel? Just not realizing. Yes, I can, and I'll do that in a rebuttal, if I may. They're right in my brief, but I don't want to take the time to go through the brief. But anyway, the point about judicial estoppel is you're punishing, of course, the father, but you're punishing the bankruptcy creditors because they can't get any money now. How does the father or you, how does anyone involved here in the room have standing to argue about the creditor's interests? Well, the trustee came in and said I want – But the trustee is not here. No, but it was in the proceedings, came in, filed papers and said I want this to go forward, and the district court says no, judicial estoppel. And did the trustee appeal? No, no. So the trustee is not here. No. So how do you have standing to be making arguments on behalf of the creditors? Well, I'm – well – What's your best authority on that? I don't know if I have any, but I will rely on logic. My logic here is that if the father had a duty to report this to protect the creditors and failed to do that, then surely the father has a duty to correct that error and to get the money into the hands of the creditors. Sort of makes sense. And so is it your position that all of the money the father would recover here he would give to the creditors? He would give to the creditors every penny up until the point where they are fully satisfied. After that, we'll talk with the court about what happens with the rest of the money. Maybe it's donated to a foundation for stray cats. I don't know. Maybe it goes to the father. I don't know. Maybe it goes to a foundation for children who are poisoned. But the point being, why punish the bankruptcy creditors? What sense is there in that? Why not let him go forward, get whatever money he can, and the bankruptcy creditors get paid off to the full penny of everything that they have, and if there's anything left over, we can fight about it then. Or at least discuss it. How does that – I guess I'm trying to figure out – how does the need to protect bankruptcy creditors relate to any factor that the district court considered in applying judicial stop? I don't think the district court considered the case law on the point, which was presented, the case law being that there can be circumstances, if the mistake was indeed innocent and unknowing. That's the case you're going to give us. Yeah, the two cases, the U.S. Supreme Court and one of the Ninth Circuit cases. Do you want to stop now and reserve the rest of your time? I'd love to, but I want to say two words, hypoxia and neurotoxicity, and a few words after that. The expert that they had said that there are long-term effects here because of hypoxia, but more likely because of neurotoxicity. And the district court said, no, I'm not convinced that that should go to the jury, and I believe that was a mistake. I'd like to ask you about something that troubled me in your brief, which is at your brief at page 29 to 30, when you're talking about defendant's expert, Mr. Goodman, and you say that the expert said that he admitted that R.M. had suffered brain injury, and when I read the statement that you seem to be citing, it says that neither his ingestion of Aquedots or his experience in coma resulted in brain injury, which seems like the opposite of saying that he suffered brain injury, and I'm wondering if you can point to anything in that expert report that would lead me to feel like your brief wasn't mischaracterizing the record. If there's been a mischaracterization, number one, I apologize. I don't do that unless I really had a midnight moment. I'll check when I sit down and see if I can find that, and if I can't find that, I confess error and throw myself on the mercy of the court. It was pointed out in your opposing counsel's brief, so I don't think it should be a surprise that I would be asking about this. No, Your Honor, not a surprise. I'll reserve my remaining time. 29 and 30, Your Honor? Your Honor? Pages 29 and 30? Oh, you discuss it in pages 29 to 30 and footnote 59. First brief on? Your blue brief, yes, and you're citing ER 172. Okay, thank you, Your Honor. Good afternoon. I am John Querio of Horvitz & Levy, and I represent defendants, appellees, the spinmaster entities, and Toys R Us. This court should affirm the judgment across the board because all of plaintiff's challenges to the district court's pretrial rulings fall short. I'll begin with punitive damages where plaintiff's counsel did. Can you walk us through the evidence showing what was known about the foreign Aquedots maker and any toxicity problems with other products they made? Sure, absolutely. Spinmaster was the United States distributor of Aquedots, which were produced and manufactured by a company about three rungs up the production ladder. There was a factory in China known as Wangqi Manufactory that was subcontracted to do that by this company, JSSY, also a Chinese company, which was contracted to do that by Moose Enterprises, the inventor of this product, and Spinmaster was the United States distributors of the product. So Spinmaster introduced this product onto the American market in April 2007. After having conducted, and with respect my colleagues have mistaken, that there was no product testing done, an extensive battery of product testing was ordered by Spinmaster from reputable, certified, independent, third-party testing agencies. Those were done both before and during the marketing and distribution of this product. Can you explain how those tests didn't detect this problem? Well, most of the tests were not geared specifically towards whether this product would metabolize into GHB or some neurotoxin, because Spinmaster had no knowledge or way of knowing that a chemical switch had been made by JSSY several rungs up the ladder. But there were some tests done. In particular, there was an oral toxicity test done using live animals. They were fed this product, and the evidence in the record, shows that the animals showed no adverse symptoms. Now, I don't know, it's not in the record as to why that would be the case, and obviously this incident happened, so obviously there was something there. But I think the important point to remember here is that Spinmaster had no knowledge or way of knowing prior to RMs, the child's incident in this case, in July 2007, that there might have been a problem. Now, as Your Honor pointed out, Judge Friedland, Spinmaster was under no obligation, at least from a punitive damages standpoint, to do anything. It could have just blindly sold this product on the market with no knowledge of what was in it. But it didn't just do that. It went beyond that. It could have done that even though it's known or should have known? Well, the standard here is the evil mind standard, as Your Honor pointed out, and that constitutes conscious and deliberate disregard. It's not just could have known. It's conscious disregard. So here, because of the Volts v. Coleman case, which was mentioned earlier, Spinmaster could have, even if it had known of a potential product defect, still sold this product. Now, that might have given rise to negligence liability, of course, but for purposes of the evil mind punitive damages standard, that itself, we would not have been liable. But Spinmaster wanted to be a responsible corporate citizen, and so it went beyond that. And it did order an extensive battery of product tests. Now, plaintiffs argue that the testing should have been better in certain ways. It could have been geared towards other types of things. That may or may not be true. But I think the important thing to keep in mind is nothing there leads to any sort of inference of conscious disregard of a known substantial risk to consumers. And, again, I think it's very important to remember, counsel mentioned JSSY acted with intent in making this chemical switch. Spinmaster had no involvement in that decision, had no knowledge or way of knowing of that decision. It didn't discover that decision until October of 2007, several months after the incident in this case, which means that it is irrelevant for purposes of assessing the evil mind under Arizona law in this case. I'd also like to address one thing that my colleague on the other side mentioned, which is that the Consumer Product Safety Commission made findings. That is inaccurate. The CPSC did not make any findings. The CPSC staff came to a settlement agreement with Spinmaster, and the commission, which is different from the staff, the commission accepted that settlement agreement without making any findings of liability or anything else, and Spinmaster did not admit to any liability. Now, the CPSC staff made allegations about what it thought it could prove in a proceeding if it had gone forward in front of the commission. But those allegations were never proven. Evidence was not provided. And finally, on the point that this was a crime, Spinmaster vigorously disagrees with that characterization, but regardless of whether that's true or not, the only crime that plaintiffs point to is, under their interpretation, a strict liability standard that simply importing, even unknowingly importing, a hazardous substance into the United States constitutes a crime, according to plaintiffs. That does not meet the evil mind standard under Arizona law. If I could turn quickly to the judicial estoppel point, plaintiffs argue that the trustee should have been allowed to intervene. As your Honor, Judge Friedland, recognized, there is no appellate standing here to raise that point. But I think the larger issue of whether this should be allowed to proceed for the benefit of creditors, that argument was made in a couple earlier Ninth Circuit cases, specifically the Hamilton v. State Farm case, and an earlier case, Hay, which rejected that argument. Hay was more in passing. I believe Hamilton made a more concerted analysis of it. So the law of the circuit bars that sort of argument off the bat. Beyond that, I think the judge recognized that the integrity of the court, the integrity of the judicial process was at stake, and that's why judicial estoppel was important here. Even if this court were to disagree, our brief lays out alternative arguments under Arizona law why these particular claims fail anyway. And just lastly, on the expert exclusion point, we briefed that if this court has any questions, I'd be happy to answer them. But I think the district court properly exercised its wide discretion in excluding those opinions, partly for untimely disclosure and partly for unreliability under Daubert. So unless there are any other questions, I will... With respect to the trustee, did the trustee move to intervene here? The trustee did move to intervene in this case on the eve of trial. And that was after the judicial estoppel had been adjudicated, right? That was five or six months after the summary judgment ruling, yes. And, of course, we don't have the trustee appeal it. That's right. The trustee did not file a notice of appeal. Okay. Was the summary judgment briefing, did it include briefing on judicial estoppel? That wasn't just a surprise, right, that all of a sudden the judge... No, Spinmaster moved for summary judgment on judicial estoppel, so there was full briefing on that. And when that briefing happened, Mr. Monhe still didn't go back to the bankruptcy court to fix it? Not for an additional about five months or so. That's correct. I'll turn the lectern over to my colleague, Mr. Miller, from Moose Enterprises. A little tight. Good afternoon. May it please the Court. Jeffrey Miller, Louis Brisbois, Biscard, and Smith on behalf of Defendant Appali and Cross Appellant, Moose Enterprise Pty. Ltd. I don't want to repeat comments made by co-counsel. I think I'll just talk about a few things that I think are extremely important. And one of the things that were mentioned here this afternoon that is critical is the bar in Arizona is very high for punitive damages. That is what the law says in Arizona, and that is the problem I think the plaintiff is facing in this particular case. This is a situation where, as the traditional law in Arizona says, the defendant's evil hand must be guided by the evil mind. And the cases talk about what an evil mind is. It talks about looking at the nature of the conduct, the duration. But one of the key ingredients is the degree of awareness of the harm and the risk involved. The main problem here is, as admitted by plaintiff, is none of the defendants were aware of the toxicity here. The law in Arizona is not you should have tested. The law is such that it is something where you have an evil mind, a conscious disregard, a conscious or intentional evil mind to commit an act. By its very definition, saying you should have tested and you didn't know is a significant, significant problem. And as a comment was made here this afternoon, even if there was some kind of notice of some type of problem with the product, we're in a situation with the Volts case, with the Piper case, where there was actual knowledge of a problem with the product, more than we have here. And the court says the rule is continuing to market a product is not in and of itself sufficient to show evidence of state of mind necessary for punitive damages. So I think in that way the law is very clear. There was a reference to a lack of testing. Moose, in fact, did testing. It did testing in 2007. It did so in relation to some concerns about not toxicity but choking. There were a few reports where young children had swallowed and they found some type of debris in the throat. So there was testing done. And not just to anywhere. Testing was done by world-class laboratories to check the safetiness as to choking and for potential toxicity. So can you explain how the testing didn't show this problem? I can't, Your Honor.  But if there was a problem associated with the testing, that would go to negligence. It certainly wouldn't go to evil mind. The fact that Moose was outgoing and was concerned shows the opposite of evil mind. So the bottom line there is that that action shows a lack of evil mind. In fact, it reminds me that after the testing, they actually added a bitter agent to the product so that children would spit it out. That is, again, I think the opposite of what we're looking at with an evil mind. There was a comment about JSSY that they at least committed some type of evil mind act and somehow Moose should be held responsible under an agency theory. There is no evidence in my review of this record to show that even if JSSY used a different or substituted the particular ingredient, that JSSY knew it was toxic or was going to cause a problem. Was it maybe negligent by not checking on it when it substituted it? Possibly. But certainly not evil state of mind. And there's also a significant problem, as we raised in our cross-appeal, about the whole idea of agency in this case anyway. This is a chain of distribution case. I'm sorry. If we agree with your side in the main appeal, do we need to reach any of your cross-appeal arguments? No, Your Honor, and I was going to say that that is absolutely conditional in every respect, and so you would not have to address that at all. I think we'll move on then to the judicial estoppel. And the key there, in my opinion, is the law, again, is very clear. In a bankruptcy case, in the context, a party will be judicially estopped from asserting a cause of action not raised in the reorganization plan or in the schedules. And there's case authority that both parties cited for that. But what's the reason for that? The reason is to protect the integrity of the bankruptcy court. Judges in the bankruptcy court, trustees in the bankruptcy court, creditors in the bankruptcy court all depend upon being honest with the schedule. And I'll be honest with you here myself. The trial judge here just didn't buy the story. They didn't buy the story relative to not knowing what was going on. This plaintiff, by the way, had a degree in finance. He was a financial advisor at some capacity in his career. We also know from the record that the lawsuit was filed and the discharge actually occurred three weeks later. Five years of litigation went by, no reopening of the bankruptcy. When was it reopened? When the actual claim was dismissed by the court. The bottom line is that there isn't justification. There's certainly no abuse of discretion for what the court did. And under both the judicial estoppel issue and the punitive damage issue, we represent that it should be affirmed. Thank you. Mr. Abney? Your Honor, I checked that page in the copy I have of the report by Goodman, and I believe you were absolutely correct. I should have said experienced coma-like symptoms instead of experienced brain injury, and that is my fault. I apologize to the court for that. As far as the bankruptcy-related precedent, it's New Hampshire v. Maine, United States Supreme Court, 532 U.S. 742, specifically page 753, 2001, New Hampshire v. Maine. And the second opinion is N. Ray Corey, C-O-R-E-Y, 892 Fed 2nd, 829 at page 836, 9th Circuit, 1989. But there are any number of other cases standing for the same proposition. You said page 753 of New Hampshire v. Maine? Yes, that was the page that I found in my brief. There could be other pages that are on point as well. And what proposition do you think is on that page? Oh, well, I don't have it right in front of me. I can find it in just a moment, and I'll tell you what I cited it for you in just a second. I see. It does say that it could be appropriate not to apply judicial estoppel when the position was based on inadvertence or mistake. But how can we view your client's actions as totally inadvertent and a mistake when judicial estoppel was briefed, then there's a ruling on it, and it's not until five months later that your client corrects the bankruptcy proceeding? That doesn't look like as soon as he learned there might be an issue, he corrected it. Well, he learned about it, and before the critical point in these proceedings, he asked for relief, asked the trustee to come in. Trustee comes in and tries to deal with the problem at that stage before this is going to the jury, before we actually worry about the damages. But he can't do it because of judicial estoppel. I don't understand your answer. I mean, when you were up earlier, you made it sound like your client just didn't know this issue might exist. He didn't know. That is not true because as soon as it gets briefed at summary judgment and people are arguing these claims need to be dismissed for judicial estoppel, as soon as that happens, he knows there's an issue. So why didn't he correct it at that point? I don't understand what you're saying. We have two ships passing the night. The original mistake is way back at the beginning where he didn't realize it was supposed to be listed as an asset. That's the original mistake. Now, that needs to be corrected. So why didn't he correct it as soon as the briefing on summary judgment says his claims should be dismissed? Well, I don't know why they didn't instantly go to the bankruptcy court. I would have gone there in a heartbeat and just banged on the doors. And so because he didn't, why isn't this judicially estopped? But if the original mistake happens way back at the beginning, what matters is correcting it before this case goes to the jury. Now, if he was a little bit slothful in getting it corrected before the case was ready to go to the jury, I don't see why that matters. What matters is you've got to get it corrected so the bankruptcy creditors can get their money. Why should they be penalized for the original mistake and then, you know, because he's a little slow in correcting it way down the line. So I don't see anything in New Hampshire v. Maine that addresses that. Do you have any proposition, any case for the proposition that you can wait a long time to correct a mistake? I doubt I can find an identical case, but I will if you guys don't issue the ruling tomorrow. I'll see what I can find, Your Honor. All right. I still got a few minutes, a minute, I guess. I object to the proposition that the bar is so incredibly high in Arizona for punitive damages. Deliberate indifference and conscious disregard are not that hard to factor in, especially in a case like this. And especially in a case where you've got the agent intentionally adding something that is bad to this product. Why shouldn't the principal be liable for that? But there was no chance at all to present that to the jury. A lot of what I think has happened in this case is the... You're out of time. Oh, it's going up. I'll let you wrap it up. Okay. One second. I'll make a very long sentence, if I may. I think a lot of the confusion here is that we tend to focus on certain things, but you had a duty to do this particular thing where the duty is really to make sure that you are selling and distributing a safe product to the public. All of the things that go into that relate to the standard of care. And the standard of care, the duties unquestionable here and the standard of care, they really exhibited behavior that's conscious disregard and deliberate indifference. Thank you very much, Your Honors. Thank you very much. Thank you both for your arguments. You are excused, if you were going to ask that. Yes, you are.
judges: Leavy, Murguia, Friedland